UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br>v.<br>MICHAEL JOSHUA BURCIAGA,<br>Defendant. | Case No. 3:20-cr-00060-MMD-CLB-1<br><br>ORDER |

**I.   SUMMARY**

A grand jury indicted Defendant Michael Joshua Burciaga on three counts involving first degree murder within Indian Country (on the Pyramid Lake Indian Reservation), violations of laws protecting unborn children, and domestic assault by a habitual offender for stabbing his pregnant girlfriend to death, also causing the death of her unborn child. (ECF No. 85.) This case is fast approaching trial. (ECF No. 93.) Before the Court is Mr. Burciaga's motion to suppress statements that he made to FBI Special Agent Cassie Taylor and Pyramid Lake Police Officer Derek Jakob at Renown Regional Medical Center (the "Hospital") the morning after the alleged offense conduct. (ECF No. 95 ("Motion").)[1] The Court held a hearing on the Motion on May 12, 2023. (ECF No. 131 (the "Hearing").) As further explained below, the Court will deny the Motion because the evidence the parties submitted indicates that the first *Miranda*[2] warnings were sufficient, Mr. Burciaga reinitiated contact by asking to talk to Agent Taylor after invoking his right to counsel, and his second waiver of his *Miranda* rights was still knowing and voluntary despite his recent intoxication, medication, pain, and lack of sleep.

---

[1] The government filed a response (ECF No. 120) and Mr. Burciaga filed a reply (ECF No. 132), along with a supplement (ECF No. 127).

[2] *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

## II.  FINDINGS OF FACT

The alleged offense conduct occurred shortly after midnight on December 15, 2020. (ECF No. 120-1 at 2.) Mr. Burciaga initially fled the house where the alleged offense conduct occurred but returned around 12:37 a.m. and was immediately detained by police officers at the scene. (ECF No. 120-4.)[3] Mr. Burciaga had significant lacerations on his hands, and was also bleeding from his head. (*See id.*; *see also* ECF No. 120-8.) Paramedics transported him in an ambulance to the Hospital. (ECF No. 120-8.) A police officer who rode along in the ambulance with Mr. Burciaga read Mr. Burciaga his *Miranda* rights towards the end of the ambulance ride, though he said he was not going to ask Mr. Burciaga any questions at that time, and just wanted to make sure Mr. Burciaga knew his rights. (*Id.* at 02:15:16-02:16:40.[4]) Mr. Burciaga arrived at the Hospital at about 2:30 a.m. (*Id.* at 02:30:36.)

At about 2:45 a.m., a nurse at the Hospital asked Mr. Burciaga a series of questions about his medical history. (ECF No. 120-10.) Mr. Burciaga responded to the questions. (*Id.*) In response to the final question in this particular clip, Mr. Burciaga stated that he had used 'crystal meth' about three days prior. (*Id.*)

At 3:04 a.m., a doctor noted that Mr. Burciaga presented with "[a]cute alcoholic intoxication with complication (HCC)" in addition to the lacerations on his hands. (ECF No. 96 (sealed) at 26.) At 4:12 a.m., another doctor noted that Mr. Burciaga did not follow commands or answer questions, and was lethargic, when that doctor examined him. (*Id.* at 2, 11.) The notes from that 4:12 a.m. visit also note, "[p]atient is admitted to the hospitalist service due to current intoxication with EtOH vs. Methamphetamine and is placed NPO for orthopedic surgery scheduled for AM." (*Id.* at 2.)

---

[3]The parties submitted several, overlapping video clips of bodycam footage. Neither party disputes the authenticity of the video evidence referenced and described herein.

[4]This refers to the white timestamp visible at the top-right of the screen. For clarity, the Court will cite to analogous timestamps throughout this order, not the time stamps showing the amount of time elapsed in each particular video.

1    Agent Taylor tried to speak with Mr. Burciaga at 4:25 a.m. but was unable to rouse him. (ECF No. 120-11.) During this video clip, Officer Jakob explains that Mr. Burciaga had gone in and out of consciousness in prior contacts they had leading up to that point, and suggests to Agent Taylor that he was thinking he would wait until about 3 p.m. that same day to attempt to talk to Mr. Burciaga again. (*Id.*)

A nurse gave Mr. Burciaga 0.5mg of Dilaudid intravenously at 4:35 a.m. (ECF No. 133 (sealed) at 2.)

Agent Taylor came back into Mr. Burciaga's Hospital room with Officer Jakob at 8:13 a.m. (ECF No. 120-12.) Officer Jakob told Mr. Burciaga at the beginning of this clip that he was there with Agent Taylor, and that Agent Taylor had some questions she needed to "run by" him. (*Id.* at 08:13:47-08:13:57.) Mr. Burciaga then asked what happened to the alleged victim, but neither Officer Jakob nor Agent Taylor responded. (*Id.* at 08:13:57-08:14:04.)

Instead, Agent Taylor introduced herself, showed Mr. Burciaga her badge, and told Mr. Burciaga (in response to another question about the alleged victim) that she "had to talk to him a little bit, and then I'll talk to you about" the alleged victim. (*Id.* at 08:14:04-08:14:18.) She then walked Mr. Burciaga through his *Miranda* rights, and he said yes in response to each of her questions. (*Id.* at 08:14:18-08:15:25.) Agent Taylor next sought Mr. Burciaga's permission to sign a written consent form on his behalf, as Mr. Burciaga had bandages on his hand. (*Id.* at 8:15:25-08:15:30.) In response to that question, Mr. Burciaga said, "hold up. It's asking me if I'm gonna answer questions without a lawyer present?" (*Id.* at 08:15:30-08:15:32.) Agent Taylor responded, "I'm asking you if you will." (*Id.* at 08:15:32-08:15:35.) To that, Mr. Burciaga responded, "no." (*Id.* at 08:15:35-08:15:37.)

Agent Taylor then replied, "nope, okay," and began to pack up her things, noting the time and date, and noting who was present. (*Id.* at 08:15:37-08:16:03.) But then Mr. Burciaga again asked Agent Taylor, "can you tell me what's going on with" the alleged victim? (*Id.* at 08:16:03-08:16:06.) To this, Agent Taylor replied, "yeah, she's dead." (*Id.*

at 08:16:06-08:16:07.) Mr. Burciaga did not say anything further, and Agent Taylor finished packing up her things and left the room, saying "take care" to Mr. Burciaga on the way out. (*Id.* at 08:16:07-8:16:38.)

At 8:17 a.m., or mere seconds later, Agent Taylor went back into Mr. Burciaga's Hospital room and asked him, "are you sure?" (ECF No. 95-6 at 08:17:15.) Mr. Burciaga replied, "I'm positive. Just nobody told me what the hell would happen." (*Id.* at 08:17:15-08:17:19.) Agent Taylor responded, "okay. We're gonna have to start over then." (08:17:19-08:17:21.) Agent Taylor again left the room and went to gather her things. (*Id.* at 08:17:21.) Mr. Burciaga sat up under his own power, apparently waiting for Agent Taylor to return. (*Id.* at 08:18:14-08:18:17.)

At 8:22 a.m., Agent Taylor came back into Mr. Burciaga's Hospital room again. (*Id.* at 08:22:14.) Upon reentry she said, "we gotta go over this stuff again, okay?" (*Id.* at 08:22:14-08:22:16.) Agent Taylor next reintroduced herself. (*Id.* at 08:22:16-08:22:16.) Then Agent Taylor explained to Mr. Burciaga that he was being recorded and explained it was important he understood what his rights are. (*Id.* at 08:22:16-08:22:41.) Agent Taylor continued, "cause when I talked to you a minute ago, I have all those rights, okay?" (*Id.* at 08:22:41-08:22:43.) Agent Taylor next asked Michael if he could read, and he replied yes. (*Id.* at 08:22:43-08:22:46.) Agent Taylor continued that she was going to have Mr. Burciaga read all of his *Miranda* rights back to her, because "I do not want to violate your rights, okay?" (*Id.* at 08:22:43-08:22:54.)

She then said, "when I left earlier you said you did not want to talk to me without a lawyer, is that right?" (*Id.* at 08:22:54-08:22:59.) "That's correct," responded Mr. Burciaga. (*Id.* at 08:22:59-08:23:00.) "Okay," Agent Taylor then said, "and then as I was leaving you called me from down the hallway and said you wanted to talk to me, is that right?" (*Id.* at 08:23:00-08:23:06.) "Yes," said Mr. Burciaga. (*Id.* at 08:23:06-08:23:07.) "What changed your mind?" Agent Taylor asked. (*Id.* at 08:23:07-08:23:10.) "Somebody finally told me what occurred with" the alleged victim, Mr. Burciaga responded, and in response to a follow-up from Agent Taylor, he said, "yeah, somebody told me what happened to her."

4

(*Id.* at 08:23:00-08:23:16.) And Mr. Burciaga next stated again that he wanted to talk to Agent Taylor in response to additional clarifying questions from her. (*Id.* at 08:23:16-08:23:24.)

Agent Taylor then had Mr. Burciaga read all of his *Miranda* rights back to her from a printed consent form, and he did so, with a break to look for tissues to blow his nose and to state that he needed some medication. (*Id.* 08:23:24-08:25:33.)

Then, a nurse entered the Hospital room with a syringe. (*Id.* at 08:25:40.) As to the medication in the syringe, Agent Taylor said, "here's the deal. You can't get all doped up and talk to me." (*Id.* at 08:25:40-08:25:48.) "Fine," Mr. Burciaga said, "let's do the questions first." (*Id.* at 08:25:48-08:25:52.) The nurse left the room without administering the medication.[5] (*Id.* at 08:25:52.) And Mr. Burciaga next let Agent Taylor sign the *Miranda* waiver form for him. (*Id.* at 08:25:52-08:26:37; *see also* ECF No. 120-15 (signed copy of waiver form).)

Prompted by Agent Taylor to 'start at the beginning,' Mr. Burciaga spent about the next 45 minutes discussing his relationship with the alleged victim with Agent Taylor and Officer Jakob. (ECF No. 95-6 at 08:26:37-09:05:11.) Generally speaking, he responded to questions and prompts when asked or prompted, but he mostly just spoke. (*Id.*) When he got to the prior evening, he eventually said, "a fight ensued." (*Id.* at 09:05:11-09:05:13.) When Agent Taylor prompted him for clarification, he said, "look, I want to let this be known right now that I'm telling you this from my own free will in order not to uh fuck this process up or slow this process down or cause any more money or any more problems for people that I'm telling you my own self because I did love her…" (*Id.* at 09:05:18-09:05:40.)

Shortly thereafter, Agent Taylor asked Mr. Burciaga, "Josh,[6] I'm going to ask you a very difficult question, okay, did you kill" the alleged victim? (*Id.* at 09:06:00-09:06:08.)

---

[5]The syringe contained Dilaudid. (ECF No. 128 (sealed) at 2.)

[6]Joshua is Mr. Burciaga's middle name. (ECF No. 85.) Some people call Mr. Burciaga 'Josh.' (ECF No. 120-4.)

5

He replied, "we got into a fight, I stabbed her up. Yes I did." (*Id.* at 09:06:08-09:06:16.) After further describing details of the alleged events for about five minutes, he again offered an unprompted explanation that he was talking with Agent Taylor because he loved the alleged victim and because he 'didn't want to complicate the process,' also noting that, in his mind, he turned himself in to the police on scene. (*Id.* at 09:06:16-09:13:05.)

Agent Taylor began to wrap up the conversation by telling Mr. Burciaga he could expect to be charged, and explained a little bit about how federal criminal cases work, including that an attorney would be appointed to him, how the initial appearance would work, and that he 'would know his rights every step of the way.' (*Id.* at 09:15:18-09:15:57.) Mr. Burciaga next asked if this case would be federal because it happened on tribal land, and both Agent Taylor and Officer Jakob responded yes. (*Id.* at 09:15:57-09:16:01.) Agent Taylor subsequently advised Mr. Burciaga not to call her once he had a lawyer because that would be a violation of his rights. (*Id.* at 09:16:30-09:16:41.) Agent Taylor concluded the interview shortly before Mr. Burciaga was wheeled into the operating room to have his hands repaired by obtaining his consent to obtain a copy of his medical records. (*Id.* at 09:16:41-09:24:00.)

**III.    DISCUSSION**

More than 50 years ago, in *Miranda*, 384 U.S. at 439, the Supreme Court adopted certain procedural safeguards to ensure that an individual who is "subjected to custodial police interrogation . . . is accorded his privilege under the Fifth Amendment to the Constitution not to be compelled to incriminate himself." Absent those safeguards, the government may not use statements obtained from "custodial interrogation." *Id.* at 444. "Those safeguards included the now familiar *Miranda* warnings — namely, that the defendant be informed 'that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any

questioning if he so desires' — or their equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 297 (1980) (quoting *Miranda*, 384 U.S. at 479).

Mr. Burciaga's Motion seeks suppression of statements he made to Agent Taylor in the Hospital, making three specific arguments based on purported violations of his rights stemming from *Miranda* and its progeny. The Court will address each of the arguments Mr. Burciaga raises in his Motion below.

But to start, the Court declines Mr. Burciaga's request for an evidentiary hearing for several reasons. (ECF No. 95 at 1.) First, the government concedes that Mr. Burciaga was in custody when he spoke with Agent Taylor at the Hospital. (ECF No. 120 at 6.) Thus, there is no dispute that *Miranda* and its progeny apply here. Second, and contrary to Mr. Burciaga counsel's argument at the Hearing, there is no factual dispute about what transpired in the moments between when Agent Taylor left Mr. Burciaga's hospital room after he invoked his right to have a lawyer present and decided not to talk to Agent Taylor, and when she came back into his room. (*Id.*) Indeed, Agent Taylor summarized those facts towards the beginning of the pertinent video, and Mr. Burciaga stated he agreed with her summary of what transpired. (ECF No. 95-6 at 08:22:54-08:23:24.) Thus, to the extent Mr. Burciaga argues there is a dispute about what happened between the videos filed as his exhibits F and G with his Motion, his argument is not supported by the record.

More broadly, Mr. Burciaga's counsel also argued at the Hearing that an evidentiary hearing was necessary to elicit more facts, and resolve purported factual disputes. But the Court finds Mr. Burciaga's arguments about why an evidentiary hearing is necessary go to the implications of undisputed facts instead of disputes about the facts themselves. For example, Mr. Burciaga's counsel insisted that an evidentiary hearing would be helpful to gather more information about the effects of the drugs Mr. Burciaga either consumed or was given leading up to his interrogation by Agent Taylor, and whether medical treatment was delayed. But there is no dispute about what drugs (and alcohol) were found in Mr. Burciaga's system, or administered to him at the Hospital, or that pain medication was not given when Agent Taylor indicated Mr. Burciaga "can't get

7

all doped up and talk to [her]." (ECF No. 95-6 at 08:25:40-08:25:48.) Indeed, the Court made findings of fact above about this. Mr. Burciaga argues that the combination of drugs in his system rendered him categorically unable to waive his *Miranda* rights. That is not a factual argument, but instead a legal one that the Court already has the necessary information to resolve.

Similarly, Mr. Burciaga's counsel argued an evidentiary hearing was necessary to determine Agent Taylor's subjective intent in her interactions at the Hospital with Mr. Burciaga. But "[a]lthough the officer's subjective intent is relevant, it is not decisive, because in determining whether interrogation occurred, the focus is upon the defendant's perceptions." *United States v. Moreno-Flores*, 33 F.3d 1164, 1169 (9th Cir. 1994) (citations omitted). And the Court can reasonably infer Mr. Burciaga's perceptions from the bodycam videos already in evidence. Indeed, the Court generally agrees with the government's argument presented at the Hearing that the undisputedly authentic video evidence already before the Court is the best evidence to evaluate the persuasiveness of Mr. Burciaga's arguments presented in his Motion. And as further explained below, the Court's observations—particularly of video and audio evidence—are always relevant to evaluating the arguments Mr. Burciaga presents.

For these reasons, the Court denies Mr. Burciaga's request for an evidentiary hearing on his Motion. The Court now turns to the arguments Mr. Burciaga raises in his Motion.

Mr. Burciaga first argues that the initial *Miranda* warnings that Agent Taylor read to him were ineffective because she and Officer Jakob downplayed their significance before she read them to him. (ECF No. 95 at 9-10.) But this argument is unpersuasive upon review of the pertinent video evidence, which is Mr. Burciaga's Exhibit F and the government's Exhibit G. While it's true that Officer Jakob suggested that the *Miranda* warnings were just something that Agent Taylor had to 'run by him,' Agent Taylor subsequently clearly explained what Mr. Burciaga's rights are, and read him each of his *Miranda* rights. (ECF No. 120-12 at 08:13:47-08:16:03.) And Mr. Burciaga indicated he

understood because once Agent Taylor finished explaining his *Miranda* rights to him, he sought clarification—"[i]t's asking me if I'm going to answer questions without a lawyer present?" (*Id.* at 08:15:30-08:15:32.) And Agent Taylor responded, "I'm asking you if you will." (*Id.* at 08:15:32-08:15:35.) To this, Mr. Burciaga responded no. (*Id.* at 08:15:35-08:15:37.) So Agent Taylor packed up her things and left the room, only asking him to repeat his name as she packed up, for what appears to be an audio recording on her phone. (*Id.* at 08:15:37-08:16:03.) She respected Mr. Burciaga's invocation. Further, the fact that Mr. Burciaga invoked his right to counsel indicates he understood his rights as Agent Taylor conveyed them the first time—regardless of the fact that Officer Jakob said Agent Taylor had to run something by him.

Moreover, the primary case upon which Mr. Burciaga relies in making this argument is factually distinguishable. (ECF No. 95 at 9-10 (citing *Doody v. Ryan*, 649 F.3d 986, 1003 (9th Cir. 2011).) The *Doody* court found (in the habeas context) that a detective's *Miranda* warnings were insufficient where the detective downplayed their significance to a juvenile who stated he had never heard of *Miranda* rights—plucked from a high school football game and interrogated overnight—falsely stating that *Miranda* only applied if the juvenile was involved in a crime and offering what became 12 pages of a transcript's worth of commentary about a one page printed set of *Miranda* warnings. *See* 649 F.3d at 1002-07. Mr. Burciaga was not a minor at the time of his interrogation, Agent Taylor's initial explanation of his *Miranda* rights was clear and without much additional commentary, and she never suggested to Mr. Burciaga they would only apply if Mr. Burciaga was involved in a crime. Agent Taylor also read him his *Miranda* rights right after she identified herself to him, and respected his decision to invoke his right to have a lawyer present. *Doody* is simply not analogous. In sum, the initial *Miranda* conversation Agent Taylor had with Mr. Burciaga was sufficient.

But while Agent Taylor was on her way out of the room, Mr. Burciaga asked her about the alleged victim again. Agent Taylor replied, "[y]eah, she's dead." (ECF No. 120-12 at 08:16:06-08:16:07.) And this question and response gives rise to Mr. Burciaga's

next argument—that the FBI agent's response that the victim was dead invalidates the *Miranda* waiver Mr. Burciaga agreed to towards the beginning of (chronologically) the next video, which is his Exhibit G and the government's Exhibit H-1. (ECF No. 95 at 10-13.)

The Court does not find this argument persuasive, either. The applicable standard asks the Court to determine whether Agent Taylor's reply that the alleged victim was dead constituted the functional equivalent of interrogation. *See United States v. Morgan*, 738 F.3d 1002, 1005-06 (9th Cir. 2013). This is a high standard, and to meet it, Mr. Burciaga must show that his later decision to waive his *Miranda* rights, "was the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response." *Id.* (citation omitted). Mr. Burciaga has not met this standard in his Motion.

Indeed, based on the Court's review of the pertinent video, Agent Taylor's statement, "[y]eah, she's dead[,]" was not a question. (ECF No. 120-12 at 08:16:06-08:16:07.) It also does not appear intended to elicit a response. (*Id.*) And whether Agent Taylor was motivated to respond to Mr. Burciaga's question by sympathy or disgust does not particularly matter. *See Moreno-Flores*, 33 F.3d at 1169 ("Although the officer's subjective intent is relevant, it is not decisive, because in determining whether interrogation occurred, the focus is upon the defendant's perceptions.") (citation omitted). Instead, *Morgan* and *Moreno-Flores* call for an objective inquiry that requires the Court to consider how Mr. Burciaga would have considered the statement. Again, based on the Court's review of the pertinent video, Mr. Burciaga did not perceive Agent Taylor's statement as interrogation because he did not respond to her at all, and indeed did not say anything else to her for the rest of the time she was in the room. (ECF No. 120-12 at 08:16:07-8:16:38.)

That said, of course, Agent Taylor's statement that the victim was dead appears to have struck a chord with Mr. Burciaga, because towards the beginning of the next video, she asked him a few times why he reconsidered his decision to talk to her, and he

responded that someone had told him the alleged victim was dead. (ECF No. 95-6 at 08:17:15-08:23:24.) But the fact that Agent Taylor's statement "may have struck a responsive chord, or even that [it] may have constituted 'subtle compulsion' is insufficient to find that [it was] the functional equivalent of interrogation." *Moreno-Flores*, 33 F.3d at 1170 (citation omitted). The Court accordingly rejects Mr. Burciaga's second argument.

The Court also notes that, towards the beginning of the video filed as Mr. Burciaga's Exhibit G and the government's Exhibit H-1, Agent Taylor led Mr. Burciaga through a detailed discussion of his *Miranda* rights, where he read his *Miranda* rights back to her off a printed document, and after which he gave her his permission to sign the government's Exhibit I, a document entitled Advice of Rights and Consent. (ECF No. 95-6 at 08:22:14-08:26:37; *see also* ECF No. 120-15 (Exhibit I).) It does not appear to the Court that Agent Taylor would have re-entered Mr. Burciaga's room had he not asked to speak with her. Indeed, Agent Taylor recounted, and Mr. Burciaga affirmed, that she returned to talk to him at his request. And as the government argues (ECF No. 120 at 14), Mr. Burciaga may re-initiate contact with Agent Taylor despite his earlier invocation, and she may accept a *Miranda* waiver from him. *See United States v. Michaud*, 268 F.3d 728, 738 (9th Cir. 2001) (finding that the defendant had re-initiated contact with law enforcement after prior invocation, and finding that set of circumstances constitutionally permissible where the officers, "began questioning her only after receiving her affirmative response and informing her of her *Miranda* rights."). The *Michaud* court continued, "[g]iven the propriety of the officers' behavior, we hold that the resumption of interrogation did not violate [the defendant's] constitutional rights[.]" *Id.* The circumstances here are analogous to *Michaud*. The Court's review of the video evidence compels the conclusion that Mr. Burciaga re-initiated contact with Agent Taylor, and then she only began questioning him again after informing Mr. Burciaga of his *Miranda* rights, which he appears to have understood. (ECF No. 95-6 at 08:22:14-08:26:37.)

That brings the Court to Mr. Burciaga's final argument, which is that his second *Miranda* waiver (the one reflected in the government's Exhibit I) was ineffective, and his

subsequent statements involuntary, because he was acutely intoxicated, medicated, sleep-deprived, and in pain during his conversation with Agent Taylor captured in the video filed as Mr. Burciaga's Exhibit G and the government's Exhibit H-1. (ECF No. 95 at 13-17.) Contrary to the tenor of Mr. Burciaga's Motion and his counsel's argument at the Hearing, there is no categorical rule that if a defendant has used drugs within the past several days, or is drunk, is tired, or in pain—than courts must consider anything the defendant says involuntary, and reject any waivers of rights as unknowing. *See Shackleford v. Hubbard*, 234 F.3d 1072, 1080 (9th Cir. 2000) ("The fact that a suspect is under the influence of drugs or medication is irrelevant if the suspect's statement was 'the product of a rational intellect and a free will.'") (citation omitted). Instead—and indeed—the parties agree that the Court's focus must be on (ECF Nos. 95 at 15-16, 120 at 17-18), "'whether [the] defendant's will was overborne by the circumstances surrounding the giving of [the] confession,' an inquiry that 'takes into consideration the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.'" *United States v. Preston*, 751 F.3d 1008, 1016 (9th Cir. 2014) (citation and emphasis omitted).

The government bears the burden of proof that a defendant knowingly and intelligently waived his *Miranda* rights by a preponderance of the evidence. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986). And when it comes to impairment, the pertinent inquiry turns on the Court's evaluation of whether Mr. Burciaga appears cognitively alert and able in the video. *See United States v. Martin*, 781 F.2d 671, 673-674 (9th Cir. 1985); *United States v. Heller*, 551 F.3d 1108, 1113 (9th Cir. 2009). Based on the evidence presented, the Court finds that the government has met its burden.

While there is no question Mr. Burciaga is in pain and struggling with congestion during the entirety of the video filed as his Exhibit G, he appears cognitively alert and able throughout it. He asked Agent Taylor for clarification when she first explained his *Miranda*

rights.[7] He gave an approximately 45 minute recitation of his relationship with the alleged victim, and responded to questions and prompts from both Agent Taylor and Officer Jakob throughout. (ECF No. 95-6 at 08:26:37-09:06:16.) He also agreed to hold off on getting pain medication that he requested after Agent Taylor told him she 'can't talk to him all doped up.' (*Id.* at 08:25:40-08:25:52.)[8] And towards the end of the video, shortly before he is wheeled away to the operating room, he volunteered that he confessed to 'stabbing up' the alleged victim of his own free will. (*Id.* at 09:05:11-09:05:40.) Mr. Burciaga also stated that he wanted to make the process, presumably, this case, go smoothly and without delay, and offered that he was making himself voluntarily accountable for the alleged stabbing because he loved the alleged victim. (*Id.*) And in the video, these statements prompted a conversation with Agent Taylor about his rights, which Mr. Burciaga also appeared to understand. (*Id.* at 09:15:18-09:15:57.) Mr. Burciaga even inquired about why this case is a federal case, and appears to have understood the explanation that it would be because it occurred in Indian Country. (*Id.* at 09:15:57-09:16:01.) Overall, the interactions captured in this video do not appear coercive. While her manner may have been brusque, Agent Taylor repeatedly informed Mr. Burciaga of his rights and emphasized that his decision to talk to her was voluntary. Nor does anything about the video suggest any significant cognitive impairment on Mr. Burciaga's part.

///

---

[7] Again, during the first encounter, after Agent Taylor finished explaining his *Miranda* rights to him, Mr. Burciaga sought clarification—"[i]t's asking me if I'm going to answer questions without a lawyer present?" (ECF No. 120-12 at 08:15:30-08:15:32.) And he invoked after she explained one of the implications of his waiver.

[8] Mr. Burciaga argued in his Motion and at the Hearing that Agent Taylor was deliberately withholding medication from Mr. Burciaga to force a confession out of him (ECF No. 95 at 16), but that is not the most reasonable inference that can be drawn from the video. Indeed, it is more likely than not to the Court that Agent Taylor was telling Mr. Burciaga that he could not accept the medication and talk to her, and Mr. Burciaga understood this when he agreed to hold off on the medication. Indeed, it appears to have been Mr. Burciaga's statement that he would hold off on the medication that persuaded the nurse not to give it, not some command from Agent Taylor. Agent Taylor also spoke directly to Mr. Burciaga about the medication, not the nurse, presenting a choice—talk to me or take the medicine—and does not appear to have been attempting to coerce him to talk to her in order to get more medicine as Mr. Burciaga's counsel suggested at the Hearing.

Said otherwise, from the Court's review of the video evidence, the Court finds that Mr. Burciaga's second waiver of his *Miranda* rights was effective, and the statements he made to Agent Taylor and Officer Jakob recorded in the pertinent video were knowing and voluntary.

At the Hearing, Mr. Burciaga's counsel focused on the fact that a nurse gave Mr. Burciaga 0.5mg of Dilaudid intravenously at 4:35 a.m. (ECF No. 133 (sealed) at 2) before his interrogation that started after 8 a.m. that same day. He suggested that Dilaudid is so powerful that it categorically renders subsequent *Miranda* waivers invalid and statements involuntary. And he mentioned two cases that involved Dilaudid, where courts suppressed statements. Mr. Burciaga provided citations to these two cases, along with several others, in his reply. (ECF No. 132.) However, contrary to Mr. Burciaga's arguments, these cases neither suggest a new inquiry based on Dilaudid's power, nor compel suppression here.

Mr. Burciaga first proffers *United States v. Conley*, Case No. CR 21-115 (SRN/BRT), 2021 WL 5890664, at *12-*13 (D. Minn. Oct. 1, 2021), *report and recommendation adopted*, Case No. CR 21-115 (SRN/BRT), 2021 WL 5446830 (D. Minn. Nov. 22, 2021). (ECF No. 132 at 2-3.) But *Conley* does not suggest that Dilaudid creates a new, categorical rule. Instead, the *Conley* court considered the fact that the defendant had been given Dilaudid as one circumstance among several that led that court to suppress statements obtained from an interrogation at a hospital. *See id.* Notably, the *Conley* court focused on its own review of an audio recording of the interrogation and the pertinent detective's testimony, both of which indicated the defendant was so drowsy and in pain that he was fading in and out of consciousness during the interrogation. *See id.* This apparent lack of consciousness, coupled with (and indeed, likely attributable to) the recent administration of Dilaudid is what led the *Conley* court to suppress the statements. This is simply unlike the circumstances here, where the Court's careful review of the video evidence indicates that Mr. Burciaga was fully conscious throughout the pertinent interrogation.

///

The same goes for Mr. Burciaga's next proffered case, *United States v. Booker*, Case No. CR 13-3 (JRT/FLN), 2013 WL 12074955, at *2 (D. Minn. Mar. 8, 2013), *report and recommendation adopted*, No. 13-003 (JRT/FLN), 2013 WL 12074956 (D. Minn. Mar. 27, 2013) (ECF No. 132 at 3), which the *Conley* court also discussed and relied upon.[9] *See* 2021 WL 5890664, at *12-*13. While the defendant in *Booker* had also been given Dilaudid, that court's analysis also focused on its review of an audio recording indicating that it was difficult for the defendant to speak, and he seemed extremely drowsy. *See* 2013 WL 12074955, at *2-*3. Again, here, Mr. Burciaga does not appear either extremely drowsy or like he had difficulty speaking. And even under the law of the Eighth Circuit, which governed the *Booker* court, "neither exhaustion, intoxication nor the influence of prescription drugs will *necessarily* invalidate a Miranda waiver." *Id.* at *2 (citations omitted).

Mr. Burciaga also proffers *United States v. Breton-Rodriguez*, 232 F. App'x 725 (9th Cir. 2007). (ECF No. 132 at 3.) But the *Breton-Rodriguez* court noted that, "waiver of [the defendant's] *Miranda* rights is not rendered involuntary simply because he was receiving morphine[,] in considerable pain[,]" and had just awoken from a four-day coma. *Id.* The *Breton-Rodriguez* court instead found the district court did not clearly err in suppressing the challenged statements based on the facts before that district court. *See id.* And the *Breton-Rodriguez* court noted as significant that the "government offered no medical evidence to support the testimony of its interviewing agents that Breton-Rodriguez had the cognitive ability to understand and waive his rights." *Id.* In contrast, here, the government pointed to the video-recorded interrogation itself, which tends to show that Mr. Burciaga had the cognitive ability to understand and waive his rights.

Finally, Mr. Burciaga proffers *United States v. Burnett*, Case No. CRIM.A. 11-274-01, 2013 WL 3380532, at *5-*6 (E.D. Pa. July 8, 2013). (ECF No. 132 at 3-4.) Similar to the other cases discussed immediately above, the *Burnett* court refused "to adopt a

---

[9]To be clear, neither of these cases bind the Court in any event. At best, the Court could look to them as persuasive authority.

1  categorical rule precluding all morphine-tainted confessions." 2013 WL 3380532, at *5.
2  However, the *Burnett* court reached the result that Mr. Burciaga seeks here (as did the
3  *Conley*, *Booker*, and *Breton-Rodriguez* courts) after making a "close call," apparently
4  without the sort of video evidence the Court has here, and with unrebutted expert
5  testimony about the effects of morphine from one of the defendant's experts. *See id.* at
6  *2-*7. And the facts are somewhat distinct as well—the defendant in *Burnett* was
7  administering himself morphine during the pertinent interview. *See id.* at *6-*7. Here, Mr.
8  Burciaga received a dose of Dilaudid about four hours before he began speaking with
9  Agent Taylor and apparently slept for several hours before the interrogation. Mr. Burciaga
10 also sat up using his own strength, apparently waiting for Agent Taylor to return, even
11 before she returned to talk with him the second time. (ECF No. 95-6 at 08:18:14-
12 08:18:17.) And again, Mr. Burciaga appears lucid and awake in the pertinent video. (*See
13 generally id.*)

This, of course, is not meant to diminish the pain that Mr. Burciaga was surely suffering during his interrogation by Agent Taylor captured in Mr. Burciaga's Exhibit G. It was difficult to watch Mr. Burciaga suffer in evaluating this Motion. It is also possible that a different person could be cognitively impaired beyond the point of voluntariness by the amount of Dilaudid, methamphetamine, alcohol, and potentially other drugs Mr. Burciaga consumed and was given in the days leading up to the charged conduct and ultimately the interrogation—particularly given his lack of sleep and the lacerations to his hands. But the video evidence indicates that Mr. Burciaga was not cognitively impaired. To the contrary, the video evidence supports a finding that Mr. Burciaga understood exactly what he was doing when he decided to speak with Agent Taylor, including when he eventually decided to tell her and Officer Jakob that he 'stabbed up' the alleged victim.

**IV.    CONCLUSION**

The Court notes that the parties made several arguments and cited several cases not discussed above. The Court has reviewed these arguments and cases and

determines that they do not warrant discussion as they do not affect the outcome of the Motion.

It is therefore ordered that Mr. Burciaga's motion to suppress (ECF No. 95) is denied.

DATED THIS 17th Day of May 2023.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE